# EXHIBIT "P"

## Chuck Lollar

To:         Chuck Lollar
Subject:    ATTORNEY-CLIENT WORK PRODUCT AND PRIVILEGED CONFIDENTIAL
            COMMUNICATION - Atlantic Coast Pipeline, LLC  gas pipeline easement from Nelson
            County Creekside, LLC Update on ACP project and summary of typical movement of
            your  just compensation claim

**From:** Demian K. Jackson [mailto:demianjackson@gmail.com]
**Sent:** Tuesday, April 10, 2018 11:25 AM
**To:** Chuck Lollar <chuck@lollarlaw.com>
**Cc:** Chip Lollar <chip@lollarlaw.com>
**Subject:** RE: ATTORNEY-CLIENT WORK PRODUCT AND PRIVILEGED CONFIDENTIAL COMMUNICATION -
Atlantic Coast Pipeline, LLC gas pipeline easement from Nelson County Creekside, LLC Update on ACP
project and summary of typical movement of your just compensation claim

**Chuck,**

**I understand your preference is for phone communications and I agree that doing so can be
useful in certain circumstances, brainstorming or discussing strategies. However, for very
complex communications I prefer to have a record for each of us to refer back to so that
there is no confusion on either end. Further, despite the initial upfront time investment, in
the end, I find email communication for complex matters to be far more efficient because
with repeated phone conversations we often have to reestablish all the facts and it is more
difficult to cut to the chase. For example, because we have communicated by email you
have a clear record of some of the pricing information, but because we talked about the
specifics by phone, there is no record for you to refer back to. My recollection is that we
pegged the house at about 300K, the land at about 975K, and 125K of improvements
(barns, fruit trees and plantings, outbuildings, extensive landscaping, well, etc).**

**We can afford the trial costs, but would have a strong preference to settle if we can end up
above our floor estimate. We are interested in meeting with appraisers, but are awaiting
answers to the following questions which are email below did not address:**

*Regarding the appraisals, we can afford that if you would recommend it. I realize there are no
guarantees, but what would you say the odds are that we do not at least get back the value we
put into it? My assumption would be that it would be extremely unlikely that we would not at
least get back (in the form of an increased offer) what we invested in the appraisal and that
most likely the investment would more than pay for itself, likely many fold. Also, I would
assume that the appraisal value would not just be limited to the negotiation stage, but also
would be valuable if negotiations fail and we did go to trial. Under what scenario would this
be a waste of money and how likely would that scenario be? I assume the only way that would
happen would be if we all of a sudden decided to give up and accept the last offer shortly after
paying for the appraisal. I would assume that eminent domain appraisal would take a much
broader view of the negative effect on property as a whole and not just calculate the lost
acreage in timber and permanent ROW. For example things like our view shed from her
existing house and the effect on the development potential of both the entirety of the property
and our long paved road frontage (both of which it bisects). What about blast zone and
potential for water contamination and the potential effect on market value?*

1

*Is it necessary to pay for 2 appraisals at this stage or was a 2nd one only needed if you're going to trial, such that we could get away with a single appraisal at the negotiation stage?*

*Assuming the appraisal is the next step, do you recommend negotiations before then or should we wait and use whatever we get from the appraisal as the basis for adjusting downwards? That would be my assumption unless I'm missing something because otherwise it would indicate that our original estimate and subsequent decreases are arbitrary. Did you get any sense as to how we could to continue negotiations? Did they say that they needed an appraisal to justify negotiations at that level or was that your conclusion from their saying "we will not even talk further at that level"?*

**You also refer to an engagement letter, but we once again note the modified terms as outlined in the attached email.**

**Thanks,
Demian**

**From:** Chuck Lollar [mailto:chuck@lollarlaw.com]
**Sent:** Saturday, April 7, 2018 3:16 PM
**To:** Demian K. Jackson <demianjackson@gmail.com>
**Cc:** Chip Lollar <chip@lollarlaw.com>
**Subject:** ATTORNEY-CLIENT WORK PRODUCT AND PRIVILEGED CONFIDENTIAL COMMUNICATION -
Atlantic Coast Pipeline, LLC gas pipeline easement from Nelson County Creekside, LLC Update on ACP
project and summary of typical movement of your just compensation claim

Demian,

Please send us a quick reply to this email so we know you received it.
Responding to your email below, going forward, it is probably best to schedule a regular time, on a weekly or bimonthly basis, to have telephone conversations about your case. As I told you when you first engaged us almost two years ago, on a referral from Ken and Anne Norwood, the best way to communicate is to call my cell (757) 735-0777, and leave a message to call you back if I'm in court, meeting with clients or other attorneys, talking to someone else, etc., and I'll call you back as soon as I can, usually that same day. Emails are not always the best form of communication.

I'll check ACP's construction schedule website and try to determine if your property is on the 2019 rather than 2018 schedule, which might explain the reason there's been no filing against you for immediate possession.
The requested easement moves for the fire chief and widow were no more or less *extreme* than your request.

Once you all enter the just compensation phase of this eminent domain project, which will be initiated by the complaint being filed and served upon you, things will begin to move pretty fast. As you might recall, this is the primary matter for which we were retained by you, pursuant to the engagement letter you signed.

ACP's complaint will seek to acquire by eminent domain acquisition temporary construction, access and/or permanent easements for the right of way of and access to its natural gas pipeline. ACP will like also file a motion (our client Enfield, NC Fire Chief Ronald Locke's hearing was

2

*Is it necessary to pay for 2 appraisals at this stage or was a 2nd one only needed if you're going to trial, such that we could get away with a single appraisal at the negotiation stage?*

*Assuming the appraisal is the next step, do you recommend negotiations before then or should we wait and use whatever we get from the appraisal as the basis for adjusting downwards? That would be my assumption unless I'm missing something because otherwise it would indicate that our original estimate and subsequent decreases are arbitrary. Did you get any sense as to how we could to continue negotiations? Did they say that they needed an appraisal to justify negotiations at that level or was that your conclusion from their saying "we will not even talk further at that level"?*

**You also refer to an engagement letter, but we once again note the modified terms as outlined in the attached email.**

**Thanks,**
**Demian**

**From:** Chuck Lollar [mailto:chuck@lollarlaw.com]
**Sent:** Saturday, April 7, 2018 3:16 PM
**To:** Demian K. Jackson <demianjackson@gmail.com>
**Cc:** Chip Lollar <chip@lollarlaw.com>
**Subject:** ATTORNEY-CLIENT WORK PRODUCT AND PRIVILEGED CONFIDENTIAL COMMUNICATION – Atlantic Coast Pipeline, LLC gas pipeline easement from Nelson County Creekside, LLC Update on ACP project and summary of typical movement of your just compensation claim

Demian,

Please send us a quick reply to this email so we know you received it.
Responding to your email below, going forward, it is probably best to schedule a regular time, on a weekly or bimonthly basis, to have telephone conversations about your case. As I told you when you first engaged us almost two years ago, on a referral from Ken and Anne Norwood, the best way to communicate is to call my cell (757) 735-0777, and leave a message to call you back if I'm in court, meeting with clients or other attorneys, talking to someone else, etc., and I'll call you back as soon as I can, usually that same day. Emails are not always the best form of communication.

I'll check ACP's construction schedule website and try to determine if your property is on the 2019 rather than 2018 schedule, which might explain the reason there's been no filing against you for immediate possession.
The requested easement moves for the fire chief and widow were no more or less *extreme* than your request.

Once you all enter the just compensation phase of this eminent domain project, which will be initiated by the complaint being filed and served upon you, things will begin to move pretty fast. As you might recall, this is the primary matter for which we were retained by you, pursuant to the engagement letter you signed.

ACP's complaint will seek to acquire by eminent domain acquisition temporary construction, access and/or permanent easements for the right of way of and access to its natural gas pipeline. ACP will like also file a motion (our client Enfield, NC Fire Chief Ronald Locke's hearing was

2

scheduled by ACP attorneys one day after he was served) for immediate possession to begin cutting the timber, trenching, blasting and installing pipe in the ground. **Chief Locke's win in federal court in North Carolina on March 16, 2018 might buy property owners a lot more time and bargaining strength.** We all should thank him for standing up for private property rights.

The federal court will then ask counsel for the pipeline company to confer with us and agree upon the following:

1. How your just compensation cases/claims should be tried (we are asking for JURY TRIALS for each client).

2. When your just compensation claims should be tried (we will check with the various federal courts' docket clerks for scheduling, but anticipate the earliest trial dates will be available in the first quarter of 2019 and run through the end of next year).

3. A plan for discovery in the just compensation phase, including cutoffs/deadlines for **filing of written reports of all expert witnesses**, including appraisers and other PREDICATE experts such as real estate brokers (addressing negative impact of the permanent access and gas pipeline easements upon marketability of client properties in the after scenario), surveyors/engineers (addressing negative impact of the permanent gas pipeline easements upon subdivision by right of client properties in the after scenario), residential and commercial real estate developers (addressing highest and best use of client properties for residential or commercial development in the before scenario and negative impact of the permanent gas pipeline easements on client properties as to HBU as residential or commercial development in the after scenario), soil scientists (addressing negative impact of the permanent gas pipeline easements upon existing and potential future septic systems/drain fields on client properties in the after scenario), water quality experts (addressing negative impact of the permanent gas pipeline easements upon existing wells, streams and other water supplies on client properties in the after scenario), hydrogeologists (addressing negative impact of the permanent gas pipeline easements upon existing streams and creeks and of compacting of ground after laying pipe as to viability of soil for crops, in the after scenario), agronomists (addressing negative impact of the permanent gas pipeline easements upon existing crops on client properties in the after scenario), structural engineers (addressing baseline structural condition of improvements/structures on client properties in the before scenario and change due to blasting/digging for the construction of gas pipeline), and others.

The deadline for preparation of and filing initial disclosures of witnesses is THIRTY (30) days and the filing of such expert reports with the federal court for the plaintiff pipeline company is typically SEVENTY-FIVE (75) days from the counsel Rule 26(f) conferences, and NINETY (90) days for landowners.

Once you are sued and served, things will therefore start to move fast.

The costs of such reports vary. As to appraisals, they typically range from $5,000 to $10,000, and as to other predicate expert reports, from $500 to $5000.
**IN ACCORDANCE WITH OUR LETTER OF ENGAGEMENT, WE DO NOT ADVANCE SUCH COSTS AND WILL NEED YOU TO PROVIDE US ADVANCE**

3

**PAYMENTS TO DEPOSIT IN OUR TRUST ACCOUNTS TO COVER THESE ANTICIPATED EXPERT COSTS.**

**The expert reports DO NOT include expert preparation for and testimony at trial, which is typically billed by the expert on a quoted hourly basis.**

Please advise if you are committed and able to pay these costs and other costs of trial, which include discovery depositions and court reporter transcript charges and preparation of all trial exhibits including large trial exhibit boards with aerial video and still pictures of your property. **These can run between $2,500 and $5,000.**

We have been asked by pipeline counsel to make a settlement proposal on behalf of each of our clients. You and I have exchanged a number of email and had a number of discussions about settling your just compensation claim and saving some of the trial preparation costs mentioned above.

To the extent that you've not already provided us this information, we would like to have the following from you, by reply email:

1. Your estimate of the fair market value of ALL your land and improvements impacted by the pipeline as of the date the condemnation lawsuit is filed. This should include all land you own upon which an easement is being acquired AND all contiguous/adjacent land titled identical to the land encumbered by the easement, and in the same use by you. This means if you own the land as a couple, contiguous land you own as a couple not encumbered by the pipeline easement may and should also be included in this estimate of BEFORE VALUE, as well as all houses and other buildings and improvements of any kind. THIS ESTIMATE IS WHAT YOU MIGHT EXPECT TO RECEIVE IF YOU SOLD SUCH TOTAL PROPERTY IN TODAY'S OPEN MARKET, NOT WHAT YOU WANT TO RECEIVE. It is not an exact figure, only an estimate, and if you need to ask local real estate brokers what they think you could get for your property feel free to do so but don't let that delay your response to us. AT A MINIMUM, GIVE US YOUR BEST GUESS. We will then email you what we think, on a percentage basis (*i.e.* the ACP pipeline company appraisers sometimes applied 30%) might be the overall reduction in that value, AT A MINIMUM, TO ESTABLISH A FLOOR YOU CONFIRM IN WRITING YOU WOULD BE WILLING TO ACCEPT TO SETTLE OUT OF COURT. We will then start negotiations much higher and try to settle for as much as we possibly can.

**Demian we've already received a lot of information about your property, so if you don't want to estimate its value and prefer to hire an eminent domain appraiser sooner rather than later, we'll schedule appointments for you to meet two or three at your property, so you have some choice.**

If you prefer to litigate, once ACP files suit, we'll try to schedule a jury trial as soon as possible.

If you do not understand any of this and want to discuss it with us, please send a reply email with (1) three proposed different days and different times for us to call you and (2) the number to call. We'll try to schedule that call over the next thirty days, assuming your also available in the evenings before 9pm. I am also available to call in the mornings after 5am.

4

We know this project and federal court litigation has been/will be unpleasant for you, and sincerely appreciate your cooperation and assistance in getting to you to closure in your just compensation claims.

Respectfully,

**Charles M. Lollar**

**From:** Demian K. Jackson [mailto:demianjackson@gmail.com]
**Sent:** Tuesday, April 3, 2018 10:29 AM
**To:** Chuck Lollar <chuck@lollarlaw.com>
**Subject:** Appraisal: Atlantic Coast Pipeline - Nelson County Creekside

Chuck,

I think you got this, but my email had nothing to do with indignation. As a client, I'm just making clear that I was not previously satisfied with the quality of service provided thus far (particularly over the last month) and that I need more timely communication and individualized attention. But I do agree that we got off track and, now that I've communicated this, I assume my concerns will be addressed going forward and based on this assumption, it is time to focus on the issues.

Some questions:

How extreme were the moves requested by the fire chief and the widow?

Regarding the appraisals, we can afford that if you would recommend it. I realize there are no guarantees, but what would you say the odds are that we do not at least get back the value we put into it? My assumption would be that it would be extremely unlikely that we would not at least get back (in the form of an increased offer) what we invested in the appraisal and that most likely the investment would more than pay for itself, likely many fold. Also, I would assume that the appraisal value would not just be limited to the negotiation stage, but also would be valuable if negotiations fail and we did go to trial. Under what scenario would this be a waste of money and how likely would that scenario be? I assume the only way that would happen would be if we all of a sudden decided to give up and accept the last offer shortly after paying for the appraisal. I would assume that eminent domain appraisal would take a much broader view of the negative effect on property as a whole and not just calculate the lost acreage in timber and permanent ROW. For example things like our view shed from her existing house and the effect on the development potential of both the entirety of the property and our long paved road frontage (both of which it bisects). What about blast zone and potential for water contamination and the potential effect on market value?

Is it necessary to pay for 2 appraisals at this stage or was a 2nd one only needed if you're going to trial, such that we could get away with a single appraisal at the negotiation stage?

Assuming the appraisal is the next step, do you recommend negotiations before then or should we wait and use whatever we get from the appraisal as the basis for adjusting downwards? That would be my assumption unless I'm missing something because otherwise it would indicate that our original estimate and subsequent decreases are arbitrary. Did you get any sense as to how we could to continue negotiations? Did they say that they needed an appraisal to justify negotiations at that level or was that your conclusion from their saying "we will not even talk further at that level "?

5

My understanding is that we have some additional time (a few months) where dominion can't cut trees due to bird migration. Unless there is a downside I'm missing, even if we will most certainly lose, we still have no interest in granting dominion early access until we have reached an agreement.

Thank you for your help.

Regards,
Demian

**From:** Chuck Lollar [mailto:chuck@lollarlaw.com]
**Sent:** Saturday, March 31, 2018 4:22 PM
**To:** Demian K. Jackson <demianjackson@gmail.com>
**Subject:** Atlantic Coast Pipeline - Nelson County Creekside - New Offer

Demian,

We'll just have to agree that we disagree on your comments below about our efforts on your and your family's behalf. Best we focus our indignation on ACP and McGuire Woods than one another.

As to inquiring about "the possibility of a slight movement of the southern end of the pipeline where it crosses the southern boundary near the creek (versus a shift of the entire pipeline towards our Western border as Greg promised) [which] involves less than 5% of the pipeline running across the property" and crossing onto a cooperative neighboring landowner, I did not get into those specifics in conversations Monday with ACP counsel and Dominion Energy Director of Engineering Services. I told them you were led to believe it could be moved further from your house, and asked that they authorize another movement of the alignment on your property away from your home.

If you want to try making a case for further route movement, knowing that neither the Enfield, NC Fire Chief/Director of Planning and Zoning/head of Halifax County Economic Development nor the 84 yo widowed owner of one of the oldest continuous family cattle farms in Virginia (and America for that matter) could negotiate even the first move, notwithstanding written requests preceding yours by a year or more, then I suggest we request a meeting with the MW partner and the DE DES at your property this coming or following week. We can show them specifics and maybe they will find a way to move it further.

As to appraisers, we're having two separate experienced eminent domain appraisers prepare appraisal reports for Mt. Rush, the cattle farm. The total costs for the two reports alone will exceed $15,000. If you are willing and able to fornt half of that, I can bring them to meet you around April 11 or 12. The other client has a Rule 26 federal pretrial order expert report deadline of April 20, so naturally we are giving that priority over owners not yet sued. We should talk about them, as it is best that *all* appraiser contact go through our office, for discovery work product reasons. A regular local appraiser is not worth engaging but helpful to call for knowledge of sales in the local market, as are experienced active real estate brokers.

My recommendation about your starting point was to start high but be willing to make an immediate downward movement of say $200k to induce ACP to move the centerline consistent

with your previous discussions with Mr. Park. And you are correct about the FERC not being likely to offer you any relief at this point.

As to early entry, a federal judge will likely grant it if/when they sue you. To my knowledge, the NC Fire Chief is the first landowner to have a federal court in our 4th Circuit deny a pipeline company immediate possession over landowner property in the last two decades, certainly since my former partner made some bad law in the 2004 4th Circuit Sage opinion.

We both need to keep the dialogue moving in a positive direction.

Chuck

**From:** Demian K. Jackson [mailto:demianjackson@gmail.com]
**Sent:** Saturday, March 31, 2018 2:17 PM
**To:** Chuck Lollar <chuck@lollarlaw.com>
**Subject:** RE: Atlantic Coast Pipeline - Nelson County Creekside - New Offer

Chuck,

I think you realize that my interest is not in how many clients you have. That is your business. However, as your client, it is definitely my business how much attention and the quality of the legal services you are able to individually devote to my case. This property is my "4[th] child" and I have not seen evidence that my case is getting the level of service it deserves and that I'm paying for (or for which you are obviously more than capable of if you were not so busy, as it appears to me). Instead, at least from my vantage point, presently it feels like you are overloaded and thus not able to devote the time and attention that our case warrants. Case in point is that I should not have to wait 4 days to receive an update after an important meeting. Frankly, it should not be necessary for me to send any reminders or make any calls in order to be appraised of an important update on my legal matters in a timely fashion. If you will be traveling and will be unavailable for an extended period after an important legal occurrence, a short text or email or having your assistant contact me before you leave is all I ask. The bare minimum that was necessary was for you send me a two-line email for text on Monday that I needed to go ahead and work on getting an appraisal lined up and that you would follow up by phone later in the week with details. Now I have unnecessarily lost a week and have to try to get an appraisal lined up during a week when most of the Charlottesville area is on spring break (so I may basically lose another week, in addition to whatever lag time it will take to get an appraisal). I received your message from Friday afternoon. Since there sometimes seems to be some confusion as to our tier of desired outcomes, I wanted to clarify again that, of course, the best option is for them to move it where Greg promised. However, I realize that at this point doing so is fairly unrealistic, and am willing to let that position go since, unless you recommend otherwise, because it appears that is not going to happen this late in the game. Further, it is unclear as to what level of detail you discussed regarding the degrees of moving the line (i.e., shifting the entire thing versus the tail end closest to our house), despite my having outlined in multiple emails and multiple phone calls the potentially more palatable option of a more abbreviated move. Based on your prior correspondence, it does not appear that you have inquired as to the possibility of a slight movement of the southern end of the pipeline where it crosses the southern boundary near the creek (versus a shift of the entire pipeline towards our Western border as Greg promised). This involves less than 5% of the pipeline running across the property and it crosses onto a cooperative landowner property who sold out early on the first offer for peanuts (and whom I'm sure would be cooperative again, particularly if Dominion threw a few thousand more bucks his way again). Please confirm that you have discussed this option

7

with Dominion's attorney and it has been rejected. If you have not, unless you recommend otherwise, please contact Dominion's attorney next week and ask and let me know the results. Further, for bargaining purposes, it would be helpful to know if Dominion is already scheduled to begin tree cutting on that southern neighbor's property because that would tell us that there is no point in holding that bargaining position. I would be willing to demand less money if this slight shift was granted because it preserves my tree screen and view shed from our house. Even an agreement to leave a handful of mature trees (5 or 10) in a single spot that are in the temporary right-of-way would be useful. Regarding FERC, we both know that the only real chance of movement is from your negotiations with Dominion's attorney. FERC will not offer any relief at this stage.

Please provide the appraiser contact information as soon as possible. Also, is there any point in getting a standard real estate appraiser or does it need to be in eminent domain specialist? Regarding the number chosen as a starting point, I note that this was selected based on my conversation with you on the phone. If this is now apparently a nonstarter, then we need to talk about something more realistic. Also, did you bring up the comparable real estate listing down the road (the email and link is attached) that I sent you during the meeting that at least somewhat supports a more than $1,000,000 valuation of the farm? Was any other information gleaned? Based on your voicemail (once again from my vantage point) it kind of sounds like both parties had a stack of files, you both got to ours, they stated "we can't move it again" and "that is too high to even negotiate," you said "you would communicate that to me"and no further information was gleaned about where we needed to get to other than the fact we needed an appraisal, and then yall moved on to the next file. I don't want to appear desperate to their attorney, but I do want to keep this conversation moving and not have my case tied to the next scheduled group meeting or your travel schedule, such that we run out of time to work through negotiations and in the end we end up getting screwed even worse than we already are by the whole process. I certainly would rather end up with at least the slight shift of the pipeline tail and a payment in the 500-600K range, but could make do in the end with only 400K (maybe 350K) and the reversion clause (with no further movement and the pipeline as platted).

You mentioned on the phone the possibility of granting them early access to begin felling trees. Under no circumstances are we willing to grant them access to cut trees until we have agreed upon a price.

Please let me know what time we can talk next week. I am not available this Monday until late afternoon.

I hope the same for you and your family.

Demian

# EXHIBIT "Q"

## Chuck Lollar

**To:** Glassman, M. Melissa
**Subject:** RE: Ellis, Locke and Nelson Co Creekside

**From:** Glassman, M. Melissa <mglassman@mcguirewoods.com>
**Sent:** Thursday, April 12, 2018 9:27 AM
**To:** Chuck Lollar <chuck@lollarlaw.com>
**Subject:** Re: Ellis, Locke and Nelson Co Creekside

Chuck,
I can't meet you at any of the properties this week. Maybe next week. Let me know what days are good for you next week.

Sent from my iPhone

On Apr 12, 2018, at 9:12 AM, Chuck Lollar <chuck@lollarlaw.com> wrote:

Melissa,
Cville attorney Demian Jackson wants a response from ACP or you to our settlement proposal letter.
Might you be able to meet me and him at his property in Nelson County tomorrow afternoon?
When are you available to talk today?
Chuck

Charles M. Lollar

## Chuck Lollar

**To:** Demian Jackson
**Subject:** RE: ACP

**From:** Demian Jackson <demianjackson@gmail.com>
**Sent:** Monday, May 14, 2018 6:54 PM
**To:** Chuck Lollar <chuck@lollarlaw.com>
**Subject:** Re: ACP

I have family obligations tonight, so it does not work. I have some time to talk tomorrow, but I am been out of town on vacation until next Monday morning.

On Mon, May 14, 2018 at 5:41 PM Chuck Lollar <chuck@lollarlaw.com> wrote:

**Demian,**
**Are you able to talk this evening around 8pm about getting your claim scheduled for mediation with ACP?**
**Chuck**

**Charles M. Lollar**
Attorney
Lollar Law, Eminent Domain & Property Rights
t.757-644-4657
m.757-735-0777
f.757-644-4659
chuck@lollarlaw.com
a.109 E. Main St. Suite 501 Norfolk, VA 23510
IMPORTANT: The contents of this email and any attachments are confidential. They are intended for the named recipient(s) only. If you have received this email by mistake, please notify the sender immediately and do not disclose the contents to anyone or make copies thereof.

1

# EXHIBIT "R"

**Chuck Lollar**

| | |
|---|---|
| **To:** | Chuck Lollar |
| **Subject:** | RE: ACP Tract# 08-121-A033 Nelson Co. Creekside LLC updated Exhibit map and Increase in Offer |

**From:** Chuck Lollar
**Sent:** Thursday, June 7, 2018 10:03 PM
**To:** Demian K. Jackson <demianjackson@gmail.com>
**Subject:** FW: ACP Tract# 08-121-A033 Nelson Co. Creekside LLC updated Exhibit map and Increase in Offer

## Demian,
**See below email received today from Doyle LS (Hardy Barrett). Their offer for easement**
**has increased to**            We are north of $900k.
**How would you like us to respond?**
**Chuck**

**From:** Hardy Barrett [mailto:hardy.barrett@gmail.com]
**Sent:** Thursday, June 7, 2018 3:00 PM
**To:** Chuck Lollar <chuck@lollarlaw.com>; Chip Lollar <chip@lollarlaw.com>; Staff at Lollar Law <staff@lollarlaw.com>
**Cc:** Daniel McNeil <dmcNeil@doyleland.com>
**Subject:** Re: ACP Tract# 08-121-A033 Nelson Co. Creekside LLC updated Exhibit map and Increase in Offer

See Updated exhibit map attached.

On Thu, Jun 7, 2018 at 2:55 PM, Hardy Barrett <hardy.barrett@gmail.com> wrote:

Good afternoon Mr. Lollar, I have been approved to increase the payment offer for Nelson Co. Creekside LLC. I have also attached the updated Exhibit map that shows the reduction in Permanent Right- of- Way down to 50 feet in width. I hope this increase in payment and reduction in Permanent Right- of- Way width will motivate Landowners to finalize the Easement Agreement. Thank you for your time and I will look forward to your response. SEE OFFER BELOW:

PIPELINE EASEMENT
TIMBER VALUE
TOTAL CURRENT OFFER

Hardy Barrett
Senior Right-of-Way Agent
304-680-2869
hardy.barrett@gmail.com

1

## Chuck Lollar

| | |
|---|---|
| **To:** | Lee, N. Patrick |
| **Subject:** | RE: NELSON COUNTY CREEKSIDE, LLC, ACP Parcel No. 08-121-A033 (GPIN/Tax ID Parcel 46-A-51) AND JAMES DAVID MATTHEWS, ACP Parcel NoS. 08-121 AND 08-121AR (GPIN/Tax ID Parcel No. 33 A 34 (147.55 acres) |

**From:** Lee, N. Patrick <plee@mcguirewoods.com>
**Sent:** Wednesday, June 20, 2018 4:31 PM
**To:** Chuck Lollar <chuck@lollarlaw.com>
**Subject:** RE: NELSON COUNTY CREEKSIDE, LLC, ACP Parcel No. 08-121-A033 (GPIN/Tax ID Parcel 46-A-51)

Well – wouldn't you know it, as soon as I responded.....
Here is Nelson County Creekside.

**N. Patrick Lee**
T: +1 703 712 5132

**From:** Chuck Lollar [mailto:chuck@lollarlaw.com]
**Sent:** Wednesday, June 20, 2018 2:26 PM
**To:** Lee, N. Patrick <plee@mcguirewoods.com>
**Subject:** RE: NELSON COUNTY CREEKSIDE, LLC, ACP Parcel No. 08-121-A033 (GPIN/Tax ID Parcel 46-A-51)

Patrick,
Any progress on this?
Chuck

1

# DUFF&PHELPS

Real Estate Advisory Group

**APPRAISAL REPORT**

*Of the*

**Nelson County Creekside, LLC
08-121-A033, Real Property**

**Estimate of Market Value and
Market Rent**

*As of*

**March 28, 2017**

**Prepared for**

**Doyle Land Services, Inc.**

**Prepared by**

**Duff & Phelps, LLC
Real Estate Advisory Group**

The information contained herein is of a confidential nature and is intended for the exclusive use of the persons or firm to whom it is furnished by us. Reproduction, publication, or dissemination of portions hereof may not be made without prior approval of Duff & Phelps, LLC.

Doyle Land Services, Inc.

# DUFF & PHELPS

## Real Estate Advisory Group

April 27, 2017

Mr. J. Warren Doyle
Doyle Land Services, Inc.
400 Lafayette Street, Suite 200
New Orleans, LA 70130

Dear Mr. Doyle:

In accordance with your request, Duff & Phelps, LLC, has performed a valuation as of March 28, 2017, of certain real property exhibited to us as that owned by Nelson County Creekside, LLC, and consisting of parcel number 46-A-51, located along the southeast side of Stagebridge Road, 1/4 mile southwest of the intersection of Stagebridge Road and Starvale Road, Shipman, Nelson County, Virginia.

This valuation summary represents an Appraisal Report as set forth under Standards Rule 2-2(a) of USPAP. The content of this report is based on the specific needs of the client. The purpose of this valuation is to express our opinion of the market value of the fee simple estate in the real property in its before and after conditions to provide an estimate of total just compensation for the proposed pipeline easement, and to express an opinion of market rent to provide an estimate of total just compensation for the proposed temporary right of way easements.

Our opinions are intended to assist Doyle Land Services, Inc., with easement negotiations related to the proposed Atlantic Coast Pipeline project. Doyle Land Services, Inc., is our client of record and the sole intended user of this report. Duff & Phelps, LLC, has no duty to any other party regarding the analysis or conclusions herein. No third party shall have the right of reliance on this report, and neither receipt nor possession of this report by any third party shall create any express or implied third-party beneficiary rights. The conclusions herein are subject to the General Assumptions and Limiting Conditions.

The subject property comprises 104.41 total acres of improved land utilized for recreational, agricultural, and rural residential purposes. The subject improvements include a single-family residence, two flat barns, and two sheds. Land improvements include gravel paving. The site will be encumbered by a proposed 75-foot-wide pipeline permanent easement encompassing 3.06 acres and a proposed temporary right of way easement encompassing 2.04 acres. In this instance, the larger parcel comprises the subject property as defined within this report. Please reference the exhibits for more information about the subject property and the proposed easement.

Additional details regarding the subject parcel follow:

Owner Information

| | |
|---|---|
| Name | Nelson County Creekside, LLC |
| Address | Southeast side of Stagebridge Road, 1/4 mile southwest of the intersection of Stagebridge Road and Starvale Road, Shipman, Nelson County, Virginia |

Taxpayer Information

| | |
|---|---|
| Name | Nelson County Creekside, LLC |
| Address | 106 Starvale Lane, Shipman, VA 22971 |
| Present Use of Whole Property | Recreational, agricultural, and rural residential |
| Present Use of Easement Area | Recreational, agricultural, and rural residential |

# DUFF&PHELPS

### Real Estate Advisory Group

Doyle Land Services, Inc.

**Land Area**

| | |
|---|---|
| Whole Property | 104.41 acres |
| Permanent Pipeline Easement | 3.06 acres |
| Temporary Right of Way Easement | 2.04 acres |
| Effective Date of Appraisal | March 28, 2017 |

All other assets and liabilities are excluded from this analysis.

Based on the information and analysis summarized in this report, it is our opinion that, as of March 28, 2017, the total estimated just compensation due to the imposition of the permanent and temporary easements is reasonably represented in the amount of $10,609, allocated as follows:

| | |
|---|---|
| Value of Permanent Pipeline Easement | $7,344 |
| Damages to the Remainder | $0 |
| Total Market Rent for Temporary Right of Way Easement | $3,265 |
| Equals Total Just Compensation | $10,609 |

The associated exposure time for the appraised property is estimated to be within 12 months as of the effective date of appraisal.

Respectfully submitted,

Duff & Phelps, LLC

Duff & Phelps, LLC

Corey R. Sell
Commonwealth of Virginia
Certified General Real Estate Appraiser
License #4001017495; Expiration: December 31, 2018

THIS LETTER MUST REMAIN ATTACHED TO THE REPORT IN ITS ENTIRETY INCLUDING RELATED EXHIBITS IN ORDER FOR THE VALUE OPINION(S) SET FORTH TO BE CONSIDERED VALID.

# EXHIBIT "S"

**Lollar Law, PLLC**
109 E. Main St. Suite 501
Norfolk, VA 23510
Telephone (757) 644-4657
Facsimile (757) 644-4659
TIN 47-4642749
April 30, 2020

Nelson County Creekside, LLC
c/o Demian Jackson, Managing Member
106 Starvale Lane
Shipman VA 22071

### STATEMENT FOR PROFESSIONAL SERVICES RENDERED

Re:  ATLANTIC COAST PIPELINE, LLC v. Demian K. Jackson/Nelson County
Creekside, LLC, Atlantic Coast Pipeline (ACP) acquisition of 50' Wide +/- and
75' wide +/- permanent and temporary easements for 42" diameter gas pipeline
over/through property designated at Parcel 46-A-51 located at 106 Stargell Lane,
Shipman, VA

| DATE | DESCRIPTION OF SERVICES | HOURS |
|---|---|---|
| 06.21.16 | Initial telephone conference with Demian K. Jackson requesting representation on a referral from neighbor Ken and Anne Norwood; Discuss attributes of 105-acre farm, improvements and concerns about proposed ACP route near his home and through children's play area | 0.50 |
| | View and study aerials using Google maps and earth | 1.00 |
| | Obtain new client information | 0.10 |
| | Draft and email engagement letter to Mr. Jackson at his request | 0.30 |
| 06.22.16 | Extensive telephone conference with Greg Park, Construction Manager, Atlantic Coast Pipeline, requesting site visit to Mr. Jackson's residence at 106 Starvale Lane in Shipman, Virginia | 0.40 |
| | Follow up with Mr. Jackson | 0.10 |
| | Review aerial map of Jackson property with proposed ACP alignment As marked up by Mr. Jackson | 0.20 |

1

| | Review ACP interactive maps and Nelson County GIS | 0.80 |
|---|---|---|
| 06.29.16 | Travel to Mr. Jackson's residence at 106 Starvale Lane in Shipman, Virginia; traffic accident prevents arrival | 3.90 |
| | Telephone conference with Greg Park, Construction Manager -ACP, regarding his meeting with Demian Jackson and his inspection of proposed pipeline centerline on property: discuss Mr. Jackson's concerns with Mr. Park | 0.40 |
| | Travel back to Norfolk while discussing meeting with Mr. Park | 2.00 |
| 06.30.16 to 07.06.16 – Telephone conversations with Mr. Park | | 0.50 |
| 07.07.16 | Email from Mr. Jackson requesting ACP/Dominion re-routing pipeline away from his home | 0.10 |
| | Call to Mr. Park about movement of pipeline in the direction requested during site visit June 29 | 0.20 |
| 07.19.16 | Email from Mr. Jackson requesting follow-up with Mr. Park regarding Jackson's requests for copy of drawing submitted by Park to Dominion upper management | 0.20 |
| | Call to Mr. Park | 0.05 |
| | Text to Mr. Park; | 0.05 |
| | Consider Jackson's proposal to contact the FERC | 0.30 |
| 07.20.16 | Review Mr. Jackson's direct communications with Greg Park (emails Lollar Law was not copied on) | 0.30 |
| | Emails from and to Mr. Jackson relating to his proposed re-route of proposed pipeline path on his property | 0.20 |
| | Advise Mr. Jackson to include me in his future communications with ACP or its agents or contractors or to stop all direct communications with Doyle Land Service agents | 0.20 |
| 07.22.16 | Obtain via internet and in letters, etc.. addresses of FERC, ACP, Doyle | 0.60 |
| 07.26.16 | Communication with Greg Park following Mr. Jackson's communication | 0.10 |
| 08.19.16 | Email from Mr. Jackson regarding ACP surveyor schedule | 0.20 |

2

Case 3:18-cv-00071-NKM-JCH Document 56-2 Filed 05/11/20 Page 23 of 55
Case 3:18-cv-00071-NKM-JCH Document 56-2 Filed 05/11/20 Page 23 of 55
Pageid#: 815

| | | |
|---|---|---|
| | Review Jackson's proposed letter to FERC | 0.50 |
| | Email to Mr. Jackson regarding Greg Park | 0.30 |
| 08.23.16 | Email from Mr. Jackson seeking advice about news coverage and surveyor response | 0.20 |
| 08.31.16 | Email from Mr. Jackson advising no surveyors arrived as noticed | 0.20 |
| | Telephone call to Mr. Jackson | 0.10 |
| 09.01.16 | Review Mr. Jackson's email to Greg Park regarding route change | 0.10 |
| | Call Mr. Park | 0.10 |
| | Internet research to locate Mr. Park | 0.50 |
| | Review prior communications from Mr. Park looking for other phone numbers, email addresses and physical addresses for him | 0.30 |
| 09.01.16 | Email from Mr. Jackson | 0.40 |
| 09.15.16 | Email from Mr. Jackson seeking advice about allowing surveyors | 0.30 |
| 09.18.16 | Research and review information about Mr. Jackson's property on Nelson County, Virginia GIS | 2.00 |
| | Email to Mr. Jackson regarding meeting | 0.10 |
| | Travel from Lexington, Virginia to Mr. Jackson's property at 106 Starvale Lane in Shipman, Virginia | 1.50 |
| | Walk Mr. Jackson's property, view children's play area, southern and western portions of 105 acre parcel | 2.50 |
| | Travel to Afton, Virginia from Starvale Lane | 0.60 |
| 09.20.16 | Email to Mr. Jackson again requesting that he direct all communications with Doyle land agents through his counsel | 0.20 |
| 09.21.16 | Reply from Mr. Jackson | no charge |
| 09.26.16 | Email from Demian Jackson regarding Doyle request to survey | |

3

| | | |
|---|---|---:|
| | water sources | 0.10 |
| 09.27.16 | Email from Demian Jackson requesting advice when Doyle is contacted about request to survey water sources | no charge |
| 09.28.16 | Receipt and review of annotated aerial of property prepared by Mr. Jackson to ACP/Doyle Land Services noting features in various places along ACP original and alternate routes | 0.80 |
| 09.28.16 | Receipt and review of extensive letter from Mr. Jackson to ACP/ Doyle Land Services | 0.90 |
| | Telephone conference with Matthew C. Sly, Doyle Right of Way representative; request that he direct ALL communications intended for Mr. Jackson and/or Nelson County Creekside, LLC, through my office; request for permission for Doyle's agents to survey and inspect water sources on 105 acre parcel at Shipman, Virginia; inquire of what is involved, who will me on property and how long they anticipate to survey; told him I would discuss with Mr. Jackson and getting back to him | 0.60 |
| | Email to Matthew C. Sly, Doyle Right of Way representative providing annotated map of Jackson property along with Jackson's lengthy letter to ACP; request that he advise when water testing will begin on Mr. Jackson's property so he can be present | 0.30 |
| | Additional emails to Mr. Sly | 0.20 |
| | Reply from Mr. Sly | 0.10 |
| | Conference call with Mr. Jackson and Mr. Sly | 0.50 |
| 09.29.16 | Review copy of email from Mr. Jackson direct to Mr. Sly | 0.10 |
| | Email from Mr. Jackson attaching lengthy letter from him to the FERC; Review letter with additional annotations to map | 0.90 |
| | Email to Mr. Jackson | 0.10 |
| 09.30.16 | Review copy of email from Mr. Jackson direct to Mr. Sly requesting screenshot of ACP proposed change to route | 0.10 |
| | Email from Mr. Sly to Mr. Jackson attaching map of proposed new ACP pipeline route requested by Mr. Jackson; review new route alignment | 0.30 |

| 10.05.16 | Place call to Mr. Park at Dominion Transmission (no reply) | no charge |
| | Telephone call to Austin Russell, Doyle Land Services agent | no charge |
| | Telephone conference with Mr. Jack Scanlon at Doyle LS, regarding proposed new alignment of ACP pipeline through Jackson property | 0.50 |
| 10.13.16 | Email to Mr. Jackson regarding ACP changes in route | 0.10 |
| 10.18.16 | Email from Mr. Jackson advising that he had direct communications with Mr. Jack Scanlon who has taken over for Austin Russell as ACP representative in negotiations with Mr. Jackson | 0.20 |
| | Review eFile received from Mr. Jackson | 0.40 |
| | Review pictures received in eFile link from Mr. Jackson | 0.30 |
| | Telephone conference with Mr. Jack Scanlon at Doyle LS, regarding his telephone conversation with Mr. Jackson, the proposed new alignment of ACP pipeline through Jackson property, and status numerous requests of Mr. Jackson for modification to the alignment (he fails to advise of ACP's intent to make initial offer of ███) | 0.50 |
| 11.22.16 | Review communications with Greg Park and Doyle agents and interactive ACP map of alignment regarding Starvale Lane property and ACP's proposed easement through it | 0.80 |
| 11.23.16 | Place call to and leave message with Thomas J. Allen, in-house counsel for Dominion Transmission, requesting information about Mr. Jackson's request for modification to proposed alignment | 0.20 |
| | Email Mr. Allen requesting follow up | 0.10 |
| | Telephone conversation with Mr. Allen regarding Jackson/NCC property | 0.30 |
| 11.30.16 | Telephone conversation with Mr. Scanlon from Doyle LS, regarding Survey of Jackson/NCC property December 1, 2016 | 0.30 |
| | Emails to Mr. Jackson regarding Doyle survey request and reply | 0.20 |
| 12.06.16 | Review Mr. Jackson's summary of Doyle survey crew activities on | |

|  | his property December 1 | 0.30 |
|---|---|---|
|  | Study color-coded aerial map received from Mr. Jackson, from surveyors showing his property boundary, prior easement alignment, new revised easement alignment and neighboring property boundaries | 0.60 |
|  | Email to Jackson with questions about survey | 0.10 |
|  | Review Jackson explanation of map received from surveyors | 0.20 |
|  | Review map again to prepare for telephone discussion with Mr. Jackson | 0.30 |
|  | Telephone conference with Demian Jackson regarding new proposed ACP route through his property | 0.40 |
| 12.16.16 | Review of email from Mr. Jackson with proposed text of email to Greg Park with Dominion | 0.40 |
| 12.19.16 | Email from Mr. Jackson | 0.10 |
|  | Review thread of July 2016 emails directly between Mr. Park and Mr. Jackson, regarding r-route | 0.20 |
| 02.28.17 | Email from Mr. Jackson advising of call from Mr. Scanlon requesting entry to continue survey activities and of certified letter from ACP/Doyle in January giving statutory notice of intent to survey | 0.20 |
|  | Email to Mr. Scanlon advising that no requested Doyle survey activities are to occur on Jackson property due to insufficient notice | 0.20 |
|  | Telephone call to Mr. Scanlon due to failure to respond to email, to request copy of Doyle certified intent no survey notice letter to Mr. Jackson and to again insist that all Doyle communications come through office of Lollar Law | 0.40 |
| 03.03.17 | Review of extensive email from Mr. Jackson proposing for first time to renegotiate engagement agreement | 0.40 |
|  | Study of different aerial showing ACP proposed alignment of Easement, attached to Mr. Jackson's email | 0.50 |
|  | Office conference regarding email and new map | 0.60 |
| 03.08.17 | Extensive telephone conference with former staff counsel for the Federal Energy Regulatory Commission to determine procedure and difficulty in getting route changes during post-application process | 0.80 |

6

| | | |
|---|---|---:|
| 03.16.17 | Email from Mr. Jackson | 0.05 |
| | Reply email to Mr. Jackson suggesting meeting to discuss membership of Nelson County Creekside, LLC | 0.10 |
| 03.24.17 | Email from Mr. Jackson regarding ACP route change and | 0.30 |
| | Review of and compare several different ACP routes proposed though Jackson property | 0.80 |
| | Calls to Mr. Park and Mr. Scanlon | 0.10 |
| 04.11.17 | Email from Mr. Jackson | no charge |
| | Office conference regarding FERC rules and regulations relative to route changes | 0.70 |
| 08.09.17 | Receipt and review of email from Austin Russell with Doyle LS | 0.20 |
| | Extensive review of ACP proposed easement agreement received from Mr. Russell with Exhibits A (plat showing route of pipeline through Jackson property, Exhibit B (additional terms to easement) and ACP Offer Calculation Sheet with mark-ups that apparently were made through ex parte discussions/negotiations | 1.80 |
| | Telephone call with Austin Russell | 0.50 |
| 08.10.17 | Emails to and from Mr. Jackson to schedule discussion of easement alignment and written documents received from Mr. Austin at Doyle | 0.20 |
| | Telephone conference with Mr. Jackson regarding ACP offer, easement terms and alignment shown on plat received from Mr. Austin | 0.70 |
| | Extensive email to Mr. Jackson attaching several files relating to his Property | 0.40 |
| | Email from Mr. Jackson responding to ACP offer he claims to have not previously received when mailed to his Starvale Lane, Shipman residence | 0.30 |
| | Email to Mr. Russell inquiring about ACP offer increased with handwriting from ███████ on ACP Offer Calculation Sheet dated July 21, 2017 to ██████ | 0.40 |

7

| 08.18.17 | Email from Austin Russell with Doyle LS requesting permission to Enter Jackson property to conduct tiger salamander survey | 0.10 |
| | Reply email to Mr. Russell copying Mr. Jackson | 0.10 |
| | Calls to Mr. Russell | 0.10 |
| 08.22.17 | Email from Mr. Jackson instructing to deny Doyle permission to survey | 0.05 |
| | Email to Mr. Russell denying permission to survey Jackson property | 0.10 |
| 11.06.17 | Review copy of letter addressed to Nelson County Creekside, LLC (NCC) at Starvale Lane address, from David W. Aman, authorized representative of ACP with Dominion, advising of FERC's issuance of certificate of public convenience and necessity on October 13, 2017 and ACP's prior negotiations with NCC and desire to acquire gas line easement through offers and future negotiations | 0.80 |
| | Office conference regarding Aman letter | 0.50 |
| 11.28.17 | Email from Mr. Jackson in response to Mr. Aman's letter, stating his goals to be (1) a lot more money advising that his house is worth about $300,000 and his land is worth about $550,000), referring to ACP's offer as "their present pittance"; (2) moving the route further away from his house; and (3) insuring the easement reverts back to NCC when no longer used for natural gas, and seeking recommendation at this point of Lollar Law | 0.40 |
| | Review facts and respond to Mr. Jackson | 0.50 |
| | Discussion with counsel for Dominion/ACP about Mr. Jackson's route change request | 0.50 |
| 12.16.17 | Email from Mr. Daniel McNeil at Doyle LS conveying same offer as Mr. Russell four months prior in August | 0.20 |
| | Review new aerial of ACP easement alignment on Jackson property and other documents attached to email from Mr. McNeil | 0.50 |
| | Emails to and from Mr. McNeil regarding offer and confirming changes in aerial of ACP easement alignment | 0.40 |
| | Email to Mr. Jackson attaching email, documents and aerial received from Mr. McNeil | 0.10 |

| 12.17.17 | Emails from and to Mr. Jackson regarding Mr. McNeil's offer | 0.20 |

| 12.18.17 | Telephone conference with Mr. Jackson regarding Mr. McNeil's email | 0.40 |
| | Review extensive email from Mr. Jackson regarding McNeil's emailed offer, along with Jackson's notes on ACP plat showing alignment of easement | 0.60 |

| 03.08.18 | Email from appraiser regarding gas pipeline easement valuation | 0.20 |

| 03.15.18 | Review and consider email from Mr. Jackson requesting we convey to ACP a $875,000 counteroffer, including as conditions precedent a requirement that the route across his property be shifted further away from his house as originally promised by Dominion's engineer, Mr. Greg Park; (2) a requirement that any easement agreement include a reversion clause such that the ownership of the easement reverts to Jackson or his heirs upon no longer being used for the transmission of natural gas; and (3) a requirement that the permanent right of way be 50 feet, not 75 (something previously offered by Doyle LS in last letter) | 0.50 |

| 03.16.18 | Emails from and to Mr. Jackson regarding counteroffer to ACP for Easement | 0.10 |

| 03.17.18 | Email from Mr. Jackson regarding letter to McGuireWoods | 0.10 |

| 03.22.18 | Extensive email communication with Mr. Jackson regarding the terms set forth in his March 15 email, regarding his *second* proposed route change, the basis needed for his $875,000 monetary demand countering an increased ACP offer of [      ] based upon six acres of permanent easement on his 104.6 acre parcel, and his other requirements; outline the procedural process under FRCP 71.1 since he is a Charlottesville attorney specializing in Intellectual Property matters | 1.20 |

| | Receipt from Mr. Jackson and review of proposed comparable listing of 50 acres on Starvale selling for $9,000 per acre, with the pipeline routed nearby (*after* value suggested by client) | 0.20 |

| | Telephone conference with Mr. Jackson regarding settlement letter to ACP | 0.50 |

| | Review of Charlottesville Area Association of REALTORS® website link provided by Mr. Jackson, to Charlie Wineberg's 50 acre improved farm, which Mr. Jackson considers inferior to his 106 Starvale Lane property and search for other more | |

| | | |
|---|---|---|
| | comparable properties to use in negotiations with MsGuire Woods | 1.20 |
| 03.23.18 | Email to Mr. McNeil at Doyle LS requesting ACP Offer Calculation Sheet | 0.10 |
| | Draft letter to Melissa Glassman, McGuire Woods partner-in-charge of Dominion Energy client account, responding to ██████ (third) offer from Doyle Land Services, LLC, on behalf of Atlantic Coast Pipeline, LLC to acquire a permanent 4.09 acre permanent gas easement and presenting a $975,000 counter-proposal to be reduced to $825,000 upon ACP re-location of easement alignment through NCC property and forward to Mr. Jackson | 0.90 |
| | Email from Mr. Jackson commenting on ACP offer of ██████ which he claims is his *initial* offer from ACP to acquire easement for pipeline and his concerns about legal fees pursuant to written engagement and in-person meeting in April | 0.50 |
| | Email from Mr. McNeil with attachment, conveying ACP offer to NCC to acquire easement for ██████ an increase of ██████ from prior offer of ██████ n August of 2017 | 0.60 |
| 03.24.18 | Email to Mr. Jackson regarding draft letter to Ms. Glassman | 0.10 |
| 03.25.18 | Emails to and from Mr. Jackson regarding proposed counter-offer letter to Ms. Glassman at McGuire Woods re ACP | 0.40 |
| | Request to Melissa Glassman to meet in person at McGuire Woods headquarters office in Richmond on Tuesday March 27 2018 to discuss and negotiate alignment and other terms of settlement of NCC easement sought by ACP | 0.10 |
| 03.26.18 | Email from Mr. Jackson confirming that he "agree[s] with that strategy" reflected in draft letter to Ms. Glassman | 0.10 |
| | Finalize and send letter making NCC counter-offer to ACP | 0.40 |
| 03.27.18 | Travel to Richmond office of McGuire Woods | 0.20 |
| | Meeting and discussion with counsel for ACP/Dominion Melissa Glassman: Discuss Mr. Jackson's Counteroffer and request for second route change | 0.80 |
| 03.30.18 | Reply to Mr. Jackson by telephone and email and correct information in emails from him relative to Tuesday March 27 meeting and his assumptions about ACP cases | 0.50 |

| 03.31.18 | Extensive email from Mr. Jackson to our email Friday, expressing His emotional attachment to NCC property, raising valuation questions in an attempt to micro-manage ongoing NCC negotiations with ACP | 1.20 |
|---|---|---|
| 04.03.18 | Email from Mr. Jackson inquiring about appraisals for his property and negotiations between ACP and other Lollar Law clients | 0.50 |
| 04.05.18 | Extensive email from Mr. Jackson revealing his emotional problems in dealing with the gas pipeline negotiations | 0.80 |
| 04.07.18 | Follow up with ACP attorney Melissa Glassman in writing and by telephone seeking response to NCC's counteroffer to sell gas easement to ACP | 0.60 |
|  | Follow up extensive communication with Mr. Jackson outlining again the manner in which a FRCP 71.1 case progresses and the need for expert appraisal reports and other documentation relating to NCC property | 0.70 |
| 04.12.18 | Requests to Ms. Glassman at McGuire Woods for response to March 26 NCC counteroffer letter and to meet with Mr. Jackson at property Friday afternoon April 13 to show her the stakes showing easement's revised alignment in relation to his home and hear his concerns | 0.30 |
| 04.13.18 | Written communications with Mr. Jackson recommending meeting at property with Melissa Glassman, mediation with Judge Waugh Crigler, and meeting to review ACP initial and subsequent offers in terms of engagement agreement he signed two years prior in June 2016 | 0.80 |
|  | Emails to and from Doyle agent Dan McNeil requesting construction schedule for ACP Parcel 08-121-A033 Nelson Co. Creekside, LLC (Jackson), receiving advice that it is on the 2019 ACP schedule | 0.20 |
| 05.14.18 | Emails to and from Mr. Jackson requesting dates to schedule mediation with Judge Crigler; advised that he is out of town with family obligations | 0.30 |
| 06.05.18 | Communication to and from Ms. Glassman regarding Nelson County Creekside representation | 0.30 |
| 06.07.18 | Receipt and review of new ACP offer of ▮▮▮▮▮ from Doyle land agent Hardy Barrett (increase of ▮▮▮▮▮ from previous offer of ▮▮▮▮▮ and exhibit map showing alignment of easement and compare to previous offers | 0.40 |

11

| 06.08.18 | Email to Mr. Jackson regarding ACP's increased offer, requesting response | 0.10 |
|---|---|---|
| | Email from Mr. Jackson acknowledging receipt of increased ACP offer but without any direction as to how to respond to ACP, instead stating that "we have not been and are not operating under the terms of your engagement agreement letter [ signed tow years prior on June 22, 2016]." | 0.30 |
| | Office conference regarding ACP's increased offer and Mr, Jackson's refusal to respond | 0.60 |
| 06.18.18 | Emails from and to Mr. Jackson regarding his insistence on renegotiating the written terms of his June 22, 2016 engagement and his refusal to in person at his property or in Charlottesville with NCC member Bridget K, Hamre, Ph.D and other members of the client limited liability company | 1.20 |
| 06.19.18 | Request from Doyle land agent Hardy Barrett for ACP cultural survey on NCC property the morning of June 20 by cultural crew David Birnbaum, Alice Muntz, Justin Harvey, Warren Wilson, and Dylan Maugh, to determine if there are artifacts areas or other sensitive areas that would affect the pipeline which were forwarded to Mr. Jackson as contact member of NCC | 0.50 |
| | Emails from MsGuire Woods attorneys Melissa Glassman and Patrick Lee proposing mediation with Judge Crigler July 11 or 12 in Richmond or Charlottesville, and requesting response to ACP counteroffer | 0.40 |
| | Telephone conference with Mr. Lee regarding mediation | 0.20 |
| 06.20.18 | Review email from Mr. Jackson proposing new terms for re-engagement for representation in ACP easement negotiation | 0.30 |
| | Receipt and review of 34 page appraisal report of Duff & Phelps valuing ACP easement through property of NCC at $10,609 | 1.50 |
| 06.25.18 | Receipt and review of 11-22-18 letter from Dominion's David Aman offering NCC          for easement | 0.30 |
| 07.09.18 | Email from Mr. Jackson proposing that Lollar Law represent NCC without specific agreement as to compensation and that "upon completion of the matter we would negotiate fair compensation based on the extent and quality of services provided. This would likely be in the form of nonbinding mediation, potentially by the VA Bar as you suggested. However, we reiterate that under no circumstances do we agree to proceed under any 1/3 of the negotiated overage based [upon signed June 22, 2016] engagement agreement" | 0.30 |

| 07.10.18 | Letter to Mr. Jackson enclosing file and advising that Lollar Law is agreeable to submit matter for resolution to Virginia State Bar Fee Dispute Resolution Program | 0.30 |
|---|---|---|
| 07.12.18 | Advise counsel for ACP directing to discontinue sending Lollar Law Documents, offers and other communications pertaining to NCC due to client disagreement | 0.20 |
| 07.13.18 | Email from Mr. Jackson following his review of transmitted file he requested | 0.40 |
| 07.16.18 | Email to Mr. Jackson providing contacts for ACP, Dominion Energy, Doyle Land Service and ACP's counsel at McGuire Woods | 0.30 |
| 07.17.18 | Email from Mr. Jackson requesting and confirming telephone conference call Wednesday July 18 | 0.10 |
| 07.18.18 | Extensive telephone conference with and email from Mr. Jackson, Negotiating new terms for engagement by NCC for ACP easements | 1.20 |
| 07.20.18 | Email to Mr. Jackson regarding his desire to re-negotiate engagement terms | 0.20 |
| 07.26.18 | Email from Mr. Jackson citing RPCs and making other threats | 0.50 |
| 07.28.18 | Draft letter to Mr. Jackson addressing his refusal to meet face-to-face | 0.50 |

**TOTAL HOURS:** 65.1*

*through June 8, 2018, additional 8.4 hours through July 28, 2018 (73.5 total)

ATTORNEYS FEES (at $495/hour for Charles M. Lollar): $32,224.50

EXPENSES:

| Photocopy and priority mail charges | $ 29.25 | |
|---|---|---|
| Travel Mileage: | | |
| June 29, 2016: 350 mi. @ $.054/mi. = | 189.00 | |
| September 18, 2016: 64 mi. @ $0.54/mi = | 34.56 | |
| March 27, 2018: 190mi/4 = 47.5 @ $0.58/mi. = | 27.55 | |
| TOTAL EXPENSES | | 280.36 |

**TOTAL:** $32,504.86
Plus 25% increase for difficulty under circumstances, complexity,
specialized area of law and contingent nature of contract fee +8,056.00
**TOTAL FEE AND EXPENSES:** $40,560.86

13

# EXHIBIT "T"

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Charlottesville Division

ATLANTIC COAST PIPELINE, LLC,

    *Plaintiff,*

    v.

10.61 ACRES, MORE OR LESS, IN
LOVINGSTON DISTRICT, NELSON
COUNTY, VIRGINIA, *et al.*,

    *Defendants.*

Lead Case No. 3:18-cv-0071-NKM-JCH

## DECLARATION OF CHARLES M. LOLLAR

1.    I am an attorney licensed to practice in Virginia and North Carolina since 1977 and have been continually active in the practice of law since that date. I am a member of the law firm of Lollar Law, PLLC, which limits its practice to eminent domain representation of private property owners and property rights litigation in Virginia, West Virginia and North Carolina.

2.    I graduated from the University of North Carolina at Chapel Hill in 1972 and from Washington and Lee University School of Law in 1977.

3.    I am an officer and leader in my local bar association, as well as a recent past member of the executive committee and council of my state bar, and a past president/chair of two of its conferences.

4.    I was recently qualified by the Honorable Richard E. Moore as an expert and provided opinion testimony on the reasonableness and necessity of attorney's fees and costs in a highly publicized case pending in his court, where attorneys fees were awarded comparable to those sought by my firm in this case.

5. I am admitted to practice before the U.S. Court of Appeals for the Fourth Circuit, the U.S. District Courts for the Eastern and Western Districts of Virginia, and the U.S. District Courts for the Eastern and Middle Districts of North Carolina. I am a member of the Virginia State Bar and the North Carolina State Bar. For more than forty-two years I have practiced throughout the Commonwealth of Virginia and North Carolina. I was second chair in my first property rights jury trial in Rockbridge County Circuit Court before Judge Holstein in 1976, under Virginia's then new Third-Year Practice Rule.

6. Over the past fifteen years, I have served as lead counsel for many landowners in this District who have been subjected to use by public service corporations and natural gas companies to acquire easements through their private properties either by negotiation or the exercise of the right of eminent domain in proceedings filed under Section 7(h) of the *Natural Gas Act*, 15 *USC* § 717f. My engagement agreement provides that I be compensated based upon a percentage of the excess of any recovery I can achieve for the clients as property owners, above a certain specific sum initially offered to them by the gas company to acquire the easements. Many property owners could not afford to pay my customary hourly rates, so this fee arrangement provides access to legal representation that often does not otherwise exist. When called upon to charge for my time, my hourly rate is customarily $600. In addition, our engagement agreements allow charges for reasonable out-of-pocket expenses.

7. In this proceeding, contrary to the terms of my engagement agreement, my client, defendant herein, require me to focus considerable time to demands to re-write my terms of engagement. Even though numerous efforts were made to direct all negotiation communications between Plaintiff's agents and Defendant through me as counsel to Defendant, I was not made aware of the initial ▮▮▮▮ offer by letter dated October 19, 2016 from Plaintiff's agent Doyle Land Services which I was told and understand was mailed to Defendant's address at 106 Starvale

2

Lane in Shipman, Virginia. I also was unaware of what appears to be a second increased offer of ████████ on July 21, 2017, and first learned about it when I received the marked-up increased third offer of ████████ on August 9, 2017.

     8.    As a result of the requirement placed upon my representation long after it began that I agree to other terms of compensation that Defendant believed to be "fair", the relationship with Defendant's member Demian Jackson deteriorated and ultimately culminated in the termination of my engagement and services, because I was unwilling, without a personal meeting and face-to-face discussion, to accept new terms placed upon my attorney-client relationship.

     9.    Since being first engaged by Defendant's member Mr. Jackson, to represent it in what extended to two years, I have devoted more than 70 hours in my representation of them, 65 of which is through the date of my termination by Mr. Jackson.

     10.    In this proceeding I am seeking an hourly rate of $495.00, which is well within the prevailing market rate for work of this specialty and kind, for attorneys with my education, training and forty-two years of experience. When considering the *County of Campbell* and *Lodestar* criteria in a contingent fee case of this difficulty and complexity, especially when dealing with the circumstances that existed in this representation, as recognized in the *Gilbert* case cited in our supporting Memorandum filed with this Declaration.

     11.    The time spent in the representation of Defendant was reasonable and necessary in a matter such as this.

     12.    Attached as **Exhibit S** to the Motion and Memorandum is a statement of the fees and expenses incurred in the representation of Defendant in these matters.

     I declare under penalty of perjury that the forgoing is true and correct.

May 5, 2020                    /s/ Charles M. Lollar

# EXHIBIT "U"

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
Charlottesville Division

ATLANTIC COAST PIPELINE, LLC,

     *Plaintiff,*

     v.

10.61 ACRES, MORE OR LESS, IN
LOVINGSTON DISTRICT, NELSON
COUNTY, VIRGINIA, *et al.,*

     *Defendants.*

Lead Case No. 3:18-cv-0071-JAG

## DECLARATION OF THOMAS E. ALBRO

     1.     I was admitted to practice in Virginia in 1972 and have been continually active in the practice of law since that date. I specialize in tort and other civil litigation including eminent domain and Property right issues on behalf of property owners and condemnors. I am a partner in the law firm of Tremblay & Smith, PLLC, 105-109 East High Street, Charlottesville, Virginia 22902. Further details concerning my qualifications and experience are set forth in my curriculum vitae, a copy of which is attached hereto as **Exhibit 1** and incorporated herein by reference.

     2.     I am admitted to practice before the Supreme Court of the United States, the U.S. Court of Appeals for the Fourth Circuit, the U.S. District Court for the Western District of Virginia, and am a member of the Virginia State Bar and the Bar of South Carolina.

     3.     I was retained to provide an opinion of whether the legal fees and costs charged by Charles M. Lollar of Lollar Law, PLLC (collectively "Lollar"), in its representation of the defendant Nelson County Creekside, LLC, in the above-captioned matter are reasonable and necessary.

4.     I have represented plaintiffs and defendants in state and federal courts at both the trial

and the appellate levels throughout the Commonwealth of Virginia. I have reviewed billing records

and have submitted affidavits and represented clients in state courts in which an award of fees was an

issue. I have qualified as an expert in the Circuit Courts of Albemarle County and the City of

Charlottesville to testify as to the reasonableness of fees and costs.

5.     As a part of my function as a trial attorney, I advise clients on the employment of

other law firms in this area when Tremblay & Smith has a conflict of interest or is otherwise

disqualified. I have also recommended other lawyers or law firms because of their specialized areas

of the law. In that capacity I regularly review the legal fees that will be charged on such referrals. I

have also been involved in cases where attorney's fees have been claimed and reviewed those fees in

relation to the effort and result, I participate in setting the billing rates which my partners and I

charge, and in that capacity, I review available information on the rates charged within this

community and elsewhere. To remain competitive, Tremblay & Smith monitors available

information concerning fees charged in this community.  Based on the above, I believe I am

knowledgeable about the billing rates which are charged in this area.

6.     I have been involved in the trial of complex cases for more than forty five years, and I

have supervised other civil litigation trials during that same period. I have litigated eminent domain

cases for and against condemning authorities and landowners. Based on this experience, I feel that I

am knowledgeable about the level of effort necessary to try eminent domain cases successfully. I

have tried cases in the United States District Court for the Western District of Virginia.

7.     I have reviewed files and records of Lollar with respect to this matter, involving the

engagement of Lollar by Nelson County Creekside, LLC, a Virginia limited liability company

owning an property located at 106 Starvale Lane, Shipman, Virginia (the "Property") consisting of

approximately 105 acres,  Nelson County Parcel No. 46 A 51, in negotiations with Atlantic Coast

Pipeline, LLC ("ACC") and its agent Doyle Land Services, LLC ("Doyle"), for the acquisition of

temporary and permanent easements for a 42" diameter high pressure gas pipeline either

"voluntarily or if and when a Certificate is granted by FERC [Federal Energy Regulatory

Commission} and ACP seeks to encumber [subject property] with an easement either voluntarily

or using the power of eminent domain (assuming it acquires such power) shall be a contingent

fee equal to one-third (33 1/3 %) of any recovery we can achieve for you *above* any initial

written offer." Among the documents reviewed were voluminous detailed emails and

correspondence between Charles Lollar, Sr. and Demian Jackson ("Mr. Jackson"), a Charlottesville

attorney focusing on intellectual property law. I also reviewed correspondence with ACP and its

attorneys, McGuire Woods, gas easement plats, exhibits, easement agreements, offer letters and offer

calculation sheets prepared by Atlantic Coast Pipeline, LLC ("ACC"), its agent Doyle Land Services,

LLC ("Doyle"), annotated aerials of the Property prepared by Mr. Jackson, and discussed the matter

with Mr. Lollar, to better understand the many issues involved. I have also reviewed the Response

and supporting Brief of Lollar Law, PLLC, in opposition to the Defendant's motion to disburse

ACP's settlement funds to Defendant without payment to Lollar.

     8.     I have reviewed the billing records of Lollar Law, PLLC, for its legal services

rendered from June 21, 2016 to July 28, 2018, showing a total amount of legal fees of $33,858.00.

Copies of these bills are attached.

     9.     Pursuant to their billing records, Charles M. Lollar has spent 68.4 hours from June

21, 2014 through June 8, 2018. The value of these services is computed at the hourly rate of $495,00

which is less than those customarily charged by him for representation in his specialty based upon his

forty three years experience, which is $600.00 per hour.

     10.     The factors I considered in assessing the attorney's fees and costs are as follows:

          a.     <u>Time and labor expended.</u> Since June 21, 2016, Charles M. Lollar has spent

3

76.9 hours over two years in connection with this case, a total of 68.4 hours of which were through June 8, 2018, when Demian Jackson, claiming to be the managing member of Nelson County Creekside, LLC, terminated the engagement agreement signed by Jackson two years prior, unless Lollar agree to new terms of engagement. The number of hours worked individually by the attorneys is reasonable given the complexity of the numerous issues, the extent to which the plaintiff challenged every issue and the result achieved. The hourly rates charged by Mr. Lollar in connection with this case are comparable to rates charged in the Mid-Atlantic Region by attorneys with specialized practices such as theirs. On information, Lollar Law, PLLC, has charged these rates to clients when not working on a contingent fee basis (i.e. Quarles Petroleum, Inc. in Fredricksburg for Thornburg I-95 exit project in Spotsylvania County).

      b.     <u>Novelty and difficulty of the questions raised.</u> This was a novel case because it involved valuing not only the land for just compensation, but also determining the impact of the permanent and temporary easements to be used for a 42" diameter high pressure gas pipeline through the center of the Property; negotiating with ACP's agents and Project Manager for the relocation of the pipeline on the Property, not once but twice, at the request of Mr. Jackson, since the first relocation was unacceptable to Mr. Jackson.  On-site meetings were required to personally inspect the topography of the Property and view marked areas where the proposed centerline of the pipeline was surveyed. In addition, a gas pipeline project of this magnitude and size were novel to Virginia, making it more difficult to obtain credible market data to support just compensation claims for damages or diminution in value to the remainder of the Property after the acquisitions and completion of ACP's project.

      c.     <u>Skill required to properly perform the legal services rendered.</u> The skill necessary to obtain favorable results and adequately represent the property owner in a case of this complexity and magnitude cannot be overstated. Substantial eminent domain law

4

experience and litigation experience was required in the representation of the property owner.

     d.    <u>Attorneys' opportunity costs in pursuing the matter.</u> Given the hours spent over two years by Lollar in rendering professional services on behalf of the property owner, and the risks inherent in any jury trial, these hours could have been spent representing other existing clients and new clients, and, therefore, they had lost-opportunity costs by representing the defendant.

     e.    <u>Customary fee for like work.</u> The rates charged for services performed by the attorneys are within an acceptable range of the rates charged by comparable attorneys with their level of experience in a limited practice specializing in eminent domain in this region.

     f.    <u>Time limitations imposed by the client or circumstances.</u> Marshalling the body of evidence, managing the difficulties in the legal issues encountered, and researching the law applicable and briefing those issues within the same time constraints imposed by the court's docket, required a total commitment of time on part of the attorneys.

     g.    <u>Amount in controversy and results obtained.</u> The property owner never authorized claims of just compensation below $800,000 during the period of representation by Lollar, yet ACP's initial offer was ██████ and ACP's 2017 appraisal of just compensation due the defendant based upon the original easement route was $10,609. Following the termination of Lollar in July of 2018, Mr. Jackson hired present counsel, Ben Perdue and Hank Howell, who settled the just compensation claim for ██████ Given the fact that the plaintiff had only offered ██████ as just compensation during the first year of Lollar's engagement, the legal fees incurred are appropriate in relation to the amount at risk to Lollar, and the potential for a greater recovery for the defendant.

     h.    <u>Experience, reputation, and ability of the attorneys.</u> From my experience, Mr. Lollar is uniquely qualified in this specialized field of litigation, having practiced in the field for two decades. Five years ago Mr. Lollar established the law firm of Lollar Law, PLLC, to

5

practice exclusively in eminent domain and property rights matters. The practice of the firm is limited to eminent domain, takings and property rights claims and litigation and the firm represents private property owners only against the government and condemning authorities. I declare under penalty of perjury that the foregoing is true and correct.

May 5, 2020                          /s/ Thomas F. Albro

# EXHIBIT "1"

# THOMAS E. ALBRO

**Tremblay & Smith, PLLC**
**105-109 E. High Street**
**Charlottesville, Virginia 22902-5115**
**Telephone: (434) 977-4455**
**Facsimile: (434) 979-1221**
**e-mail: *tom.albro@tremblaysmith.com***

Partner, Tremblay & Smith, PLLC

Education:

Cornell University- A.B., *cum laude* in American Government, 1969
University of Virginia- J.D., 1972

Licenses and Admissions:

Virginia State Bar, 1972
South Carolina Bar, 1975
U.S. Supreme Court, 1984
U.S. Court of Military Appeals, 1983
Certified mediator- Supreme Court of Virginia (1998)

Professional Associations:

Virginia Trial Lawyers Association
(President, 1990-91; Board of Governors, 1979-present)

Virginia State Bar Standing Committee on Lawyer Advertising
and Solicitation (Member, 1995-2001; Chairman, 1996-99)

Virginia State Bar Litigation Section Board of Governors (Member 1998-2004; Chairman, 2002-2003)

Fellow, American College of Trial Lawyers (Virginia Committee Chairman, 2011-2013)

Fellow, Virginia Law Foundation

Fellow, International Academy of Trial Lawyers

Boyd-Graves Conference (Member, 1979-present; Chairman, 1997-1999)

**Academic:**

**Lecturer in Trial Advocacy, University of Virginia School of Law (1985-2000)**

**Faculty Member, University of Virginia National College of Trial Advocacy**

**Civic:**

**Selected by the Attorney General of Virginia and the President of the Virginia State Bar to be** *pro bono* **legal counsel to families of victims of the Virginia Tech shootings of April 2007**

**Virginia State Board for Community Colleges (Member, 1994-2002; Chairman, 1996-1997)**

**Councilman, Charlottesville City Council (1978-1982)**

**Piedmont Virginia Community College Foundation Board (2003-2009)**

**Lawyers Helping Lawyers (Board member, 2004-present)**

**Former member, Charlottesville-Albemarle Jail Board; Ash Lawn-Highland Summer Opera Festival Board; Thomas Jefferson Regional Planning Commission**

**Military Service:**

**Commissioned an Ensign, U.S. Naval Reserve after completion of four years of ROTC at Cornell University, June 1969**

**U.S. Navy, active duty 1972-75; Reserve duty 1975-93 (CAPT, JAGC, USNR, Ret.)**

# EXHIBIT "V"

ZEN42 LLC, Plaintiff,

v.

WASHINGTON AND LEE
UNIVERSITY. Defendant.

CASE NO. 6:17-cv-00053

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

September 26, 2018

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

What was a single-count, $100,000 breach of contract case is now a $300,000 attorneys' fees litigation. *But see Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) (A "request for attorney's fees should not result in a second major litigation."). Plaintiff Zen42, LLC (Zen42) sued Washington and Lee University (W&L) for wrongfully breaching a contract concerning W&L's cooling system. After only five months of litigation and prior to summary judgment, Zen42 accepted W&L's offer of judgment for just under $100,000, exclusive of attorneys' fees. That carve-out precipitated Zen42's motion for contractual fees. The Court referred the matter to Magistrate Judge Robert S. Ballou for a report and recommendation (R&R). The R&R found the fees were excessive and reduced the hourly rates and number of hours requested.

Zen42 makes four broad objections to the R&R. W&L also presents a narrow objection to the amount of fees awarded for the cost of Zen42's expert. The Court finds that, with a limited exception, the objections are not well-taken and thus will be overruled. The Court dispenses with the factual and procedural background, as it is familiar to the parties.

**I. Hourly Rates**

Zen42 sought hourly rates for two attorneys from the firm of Hirschler Fleischer in Richmond, Virginia. Depending on the year and stage of litigation (*e.g.*, pre-filing, post-filing),

Page 2

associate Rachel Greenleaf billed between $265 and $295 per hour, while Partner R. Webb Moore billed between $455 and $490 per hour. (R&R at 3-4). Because this case was filed in the Lynchburg division (which reaches nearly to Roanoke, Virginia and encompasses Lexington, Virginia, where the events in question took place), the R&R found the relevant rate market to be central and southwest Virginia. (R&R at 4). Zen42 does not challenge that general principle but contests how the R&R applied it.

1.

Judge Ballou found that, in the relevant market, a prevailing hourly rate of $350 for an attorney with Moore's experience and $250 for an attorney with Greenleaf's experience. (R&R at 6; *see id.* at 3-5). Zen42's first complaint about this conclusion is that the R&R did not follow its own definition of the relevant market: Instead of looking to rates in central and southwest Virginia, the R&R supposedly relied only on southwest Virginia rates, which Zen42 contends are lower than rates in certain central Virginia localities like Charlottesville and Richmond.

After defining the relevant market, the R&R did make a stray remark or two about the hourly rate in (only) southwest Virginia. (R&R at 5-6). But in substance, the R&R clearly considered the rates in central Virginia cities like Lynchburg, Danville, and Charlottesville. (*Id.* citing cases)). The Court is therefore unconvinced by the objection.

On a related point, Zen42 alleges error in the R&R's refusal to apply rates from the Richmond area, which in Zen42's view would



-1-

Case 1:18-cv-00070-NKM-JCH Document 56-2 Filed 05/11/20 Page 50 of 55 Pageid#: 842

ZEN42 LLC v. Agero, F. Supp. (W.D. Va. 2018)

be justified because its Richmond attorneys were "uniquely qualified" to handle the case. (Dkt. 70 at 2). Richmond is of course—in a technical, geographical sense—part of central Virginia. But it is not within the Lynchburg division of this Court. Indeed, Richmond is not even within this judicial district. What's more, the Court is fully in agreement with the R&R's statement that this single-count breach of contract case was

Page 3

"not so complicated as to require a premium on the prevailing rate for an attorney to handle." (R&R at 4). A party entitled to fees receives a reasonable fee for an attorney who is appropriately credentialed in light of the case's nature. A party is not, however, entitled to force its adversary to pay a premium fee for the party's optimal lawyer. Fee rates in Richmond are simply not an appropriate benchmark for this case.[1]

2.

In a series of finely disaggregated arguments, Zen42 further contends that the rates charged by its attorneys are "supported by case law in this district" and their experts. (Dkt. 70 at 3-6). The gist of these points is that (1) the R&R should not have relied upon W&L's fee expert and instead have relied upon Zen42's expert, and (2) some cases in this district have awarded hourly rates of the type sought by Zen42. But the Court is in accord with the R&R's analysis, based on several cases from this district, that the rates awarded here are appropriate and those sought by Zen42 are excessive in light of the complexity of the case and geographic market. (R&R at 5-6 (compiling cases)).

As for the expert issue, Zen42 claims the R&R gave "undue weight to the unsupported expert testimony" of W&L's fee expert. (Dkt. 70 at 5). The Court has reviewed the affidavit of W&L's expert, Lori Bentley. (Dkt. 58-7). The Court finds she was qualified to opine as

an expert on fees based on (1) her twenty-plus years as a practicing litigator in Virginia and this district, including on disputes involving commercial contracts, (2) her service on her firm's executive committee, which sets her firm's fee rates for work throughout the region, (3) her familiarity with the fees of other attorneys, and (4) her review of the documents and bills in this

Page 4

case. Based on those qualifications and experiences, the Court—sitting as fact-finder—further concludes there is a reasonable factual basis for her opinion, adopts it, and holds that it is not (as Zen42 contends) "subjective and conclusory." (Dkt. 70 at 5).

In sum, the Court will overrule the objections regarding the hourly rates.

## II. Reduction of Hours

### A. Pre-litigation hours

Zen42's counsel billed 119 hours in the 11 months before this lawsuit was filed—53 hours for work related to settlement discussions and 66 hours discussing trial strategy and drafting the complaint and a Rule 12(c) motion. (R&R at 6-7 & n.3). The R&R substantially reduced those hours.

1.

First, the R&R reasoned that pre-filing attorneys' fees concerning settlement negotiations were disallowed under the contract because, under Virginia law, "attorney's fees are recoverable as direct damages only in the limited circumstance in which the breach of contract has forced a party to maintain or defend a suit against a third person." (R&R at 8 (citing cases); *see id.* (finding "fees incurred for pre-suit settlement negotiations are not direct damages from



W&L's breach of the contract, and are instead consequential damages").

It is true that "[d]irect damages are those which flow naturally or ordinarily form the contract breach." *Long v. Abbruzzetti*, 254 Va. 122, 126 (Va. 1997). They are compensable. *Id*. at 127. Yet the default rule is that attorneys' fees are *not* direct damages. *Id*. at 128 (reviewing exception for when breach also forces plaintiff to sue or defend against third party). So, as a general matter, Zen42 ordinarily would not be entitled to any attorneys' fees.

Yet this is a contractual fee shifting case. A benefit of contract law is that it allows

Page 5

parties to contract around preexisting default rules. *See Culpeper Reg'l Hosp. v. Jones*, 64 Va. App. 207, 213 (Va. Ct. App. 2015). And when terms of a contract are clear and unambiguous, they are enforced according to their plain meaning. *Ulloa v. QSP, Inc.*, 271 Va. 72, 84 (Va. 2006).

The operative provision that provides for attorneys' fees reads as follows: Zen42 may sue "for direct damages *which shall include* all costs and expenses reasonably incurred, *including*, without limitation, *reasonable attorney fees*." (Dkt. 1-1 § 18(b)(i) (emphasis added)). In other words, the parties agreed to define—as a matter of contract—"direct damages" to include all reasonable costs and expenses, which in turn definitionally included "reasonable attorney fees." (*Id*.). Without the fee shifting provision, Zen42 likely would not have been entitled to attorneys' fees as direct damages. But with the provision, it is. The only question is whether those fees and costs were reasonable, and the Court finds that they were. The Court will therefore sustain the objection to the R&R's elimination of 53 hours for work "on pre-litigation settlement negotiations" and related tasks. (R&R at 6, 8).

Because Greenleaf and Moore billed approximately an equal number of hours in the pre-litigation phase (R&R at 7), the Court will split the 53 hours between them. This yields $6,626 in fees for Greenleaf (26.5 * $250) and $9,275 in fees for Moore (26.5 * $350), for a total additional fee of $15,901.

2.

Second, Zen42 challenges the R&R's reduction, by 65%, of its hours spent drafting the complaint and its Rule 12(c) motion. The Court agrees that a reduction was warranted because the amount of time spent on those tasks was unreasonable.[2] The complaint was only eight pages

Page 6

long and, as Judge Ballou observed, based upon a well-known chronology of events for a single-count breach of contract lawsuit. The motion was longer but hardly complex. It largely recited the factual and procedural history of the dispute, which was quite familiar to Zen42 after engaging in 53 hours of pre-litigation settlement negotiations. What's more, as the Court contemporaneously characterized it, the motion was "thin gruel" that failed to define or explain key contractual terms, and also at times applied an overly favorable standard of review. (Dkt. 27 at 4-6).

In a supplemental exhibit, Zen42 faults the R&R's calculations of pre-litigation work as allegedly in error. (Dkt. 70 at 13). Zen42 says that it only billed 50.2 hours on the complaint and Rule 12(c) motion, but the R&R found that it billed roughly 66 hours for those tasks. Zen42 compares apples and oranges. Zen42's calculation only included the motion and complaint, but the R&R also included time "discussing trial strategy" in its figure. Additionally, Zen42's calculation still reveals significant, unreasonable overbilling. While Zen42 breaks out only 11.1 hours for the Rule 12(c) motion, it reveals *nearly 40*



*hours* spent drafting the 8-page complaint. Given the substantial reduction that would be taken off of that number, the Court does not find the R&R's end result to be in error.

### B. Other objections

Zen42 objects to the recommendation of reducing, again by 65%, other hours billed during and after the underlying litigation. It asserts that the R&R erred by engaging in a prohibited "proportionality analysis." (Dkt. 70 at 13-14). Zen42 misreads the R&R.

Contrary to how Zen42 sets up its argument, the R&R does not hold that the fees were unreasonable because they exceeded the value of the case. Rather, Judge Ballou took care to

Page 7

look at the totality of the circumstances. For instance, he explained that, unlike other cases awarding substantial fees, this case was short-lived, had few motions and only two parties, involved no in-court appearances, and did not proceed to (or even approach) trial. (R&R at 10-11, 12). Judge Ballou also observed that the "sheer number of internal conferences" was "unnecessary for this relatively simple case." (*Id.* at 11). Taking all of these factors into consideration holistically, Judge Ballou wrote: "Zen42's counsel simply billed too much time"; billing over 300 hours "in less than five months of litigation [was] unreasonable and excessive," and; "the number of hours expended on this case was not proportional to the underlying breach of contract claim." (*Id.* at 10, 12).

The case cited by Zen42 prohibited using "the amount of damages sought as a limit beyond which no attorney's fees will be awarded." *Lambert v. Sea Oats Condo. Assoc., Inc.*, 293 Va. 245, 257 (Va. 2017). But Judge Ballou did not do that. *See id.* at 259 (instructing court may not "say that '$6,000 in attorney's fees on a case involving a dispute

of $500' is unreasonable per se, without regard to the necessary costs of effectively litigating a claim"). Instead, as just explained, the R&R (occasionally) uses proportionality terminology in comparing the hours billed to the needs, complexity, and extensiveness of the case, not the *ad damnum* amount. In sum, the R&R properly accounted for the whole litigation, did not reduce the issue to a simplistic comparison of "amount demanded" versus "fees billed," and correctly concluded that the fees here were excessive.

Zen42's next line of argument is that the reduction imposed by Judge Ballou was "arbitrary" and "not supported by *Defendant's* evidence." (Dkt. 70 at 17). But pointing to *W&L's* evidence reverses the burden of proof. "The burden remains on the party seeking an award of attorney's fees to establish that the amount sought is reasonable." *Lambert*, 293 Va. at

Page 8

258 n.7. As explained in this opinion and the R&R, Zen42 failed to meet that burden. By doing so, it left to the Court the task of determining what portion of its fees was reasonable.

Zen42 further places blame on W&L for its fees, decrying its "many unfounded, meritless, obstructionist attempts to delay the progress of the case and hinder Zen42's pathway to much-deserved redress," as well as faulting the R&R for making "very little mention of the aggressive litigation strategy that W&L pursued." (Dkt. 70 at 17). Zen42 then surveys its view of W&L's tactics before observing that "[t]his entire narrative was before Judge Ballou." (Dkt. 20 at 18-21). Indeed. The fact that Judge Ballou nonetheless found the fees excessive and unreasonable indicates that Zen42's "narrative" was not the whole story.[3]

### III. Experts on Fee Petition



-4-

The R&R refused to award fees for three experts Zen42 retained solely for the attorneys' fee petition. (R&R at 16). Judge Ballou allowed fees for only one of the three. Zen42 takes exception to this decision. The objection will be overruled.

Zen42 did not even utilize one of the three experts in its fee petition briefing, noting that his opinions were "duplicative." (Dkt. 54 at 9 n.1). What's more, Judge Ballou—who frequently handles fee petitions by referral from district judges—has been a magistrate judge in this district for several years, and before that was a respected litigator in this district. He is extraordinarily well-positioned to know whether using three experts solely for the adjudication of fees is reasonable or, as he put it, "unnecessary." (R&R at 16). I agree with Judge Ballou's assessment. The touchstone of fees and costs is reasonableness, and the use of three experts

Page 9

solely for the fee issue was, in the context of this case, unreasonable.

## IV. Reduction of Fees-on-Fees

The R&R also reduced by 65% Zen42's billed hours for its work on the attorneys' fee petition. (R&R at 13-15). The R&R observed that Zen42's attorneys billed approximately 200 hours to the fee petition, which was roughly a third of the total hours the attorneys spent on the entire case. (*Id.* at 14). The R&R concluded "the extensive hours Zen42's counsel devoted to the attorney's fees issue [was] unreasonable and excessive." (*Id.*).

Zen42 correctly identifies the issue as "whether the fees-on-fees were reasonable." (Dkt. 70 at 23). And Zen42 concedes that its attorneys were "thoroughly familiar" with the case. (*Id.* at 24; *see Daly v. Hill*, 790 F.3d 1071, 1080 (4th Cir. 1986) (affirming, in civil

rights case, district court's conclusion that fees-on-fees were "totally unreasonable" based on several factors, including counsel's familiarity with case)). The Court agrees that the fees billed on the fee petition were excessive in the context of this short-lived breach of contract case, and it further finds that applying Judge Ballou's proposed reduction is consistent with other cases. *See Garcia v. Montgomery Cty., Md.*, No. CV TDC-12-3592, 2018 WL 1441189, at *7 (D. Md. Mar. 22, 2018) (finding 40 hours on a fee petition to be reasonable when case—unlike this one—proceeded through extensive summary judgment proceedings and "settled just short of trial"); *Xiao-Yue Gu v. Hughes STX Corp.*, 127 F. Supp. 2d 751, 770 (D. Md. 2001) ("[W]here the legal questions were not difficult and the case was not complex, it was unreasonable to devote more than twenty percent (20%) of the time expended for the main representation toward preparing a

Page 10

petition for attorneys' fees." (citing *EEOC v. Serv. News Co.*, 898 F.2d 958, 966 (4th Cir. 1990))); *Virginia-Pilot Media Cos., LLC v. Dep't of Justice*, No. 2:14CV577, 2016 WL 4265742, at *6 (E.D. Va. Aug. 10, 2016) (reducing by 60% "excessive" fees on fees that amounted to one-third of total amount billed in case).

## V. W&L's objection to Zen42's Expert

Lastly, W&L lodges its own objection to the award of over $26,000 in fees for Zen42's technical expert, Jack Soost. (Dkt. 72). W&L presents two arguments: (1) the expert fees were excessive and thus unreasonable given the lifespan of the case, and; (2) Soost's time entries were "insufficiently detailed" and block-billed. (*Id.* at 3-5).

Those arguments were not in W&L's opposition brief to Zen42's motion for fees. (*See generally* dkt. 58). Instead, W&L conclusorily asserted that "Plaintiff's expert



Case 3:18-cv-00007-NKM-JCH Document 56-2d 05/05/21/207 of Page 54 of 55
ZEN42 LLC v. Agere case, Inc. (W.D. Va. 2018)
Pageid#: 846

billed an exorbitant amount." (*Id*. at 15). So Judge Ballou rightly observed that "W&L does not provide a specific reason to suggest that the expert fees of Mr. Soost are unreasonable or that the specific hours spent by [him] were unnecessary and excessive"; Judge Ballou thus awarded those fees. (R&R at 15). Only now, after Judge Ballou issued his R&R, has W&L developed a meaningful argument against Soost's fees.

"A magistrate's decision should not be disturbed on the basis of arguments not presented to him." *ContraVest Inc. v. Mt. Hawley Ins. Co.*, 273 F. Supp. 3d 607, 620 (D.S.C. 2017). "Courts have frowned upon objections to R&Rs that make new arguments" before the district

Page 11

court. *Elliott v. Oldcastle Lawn & Garden, Inc.*, No. 2:16-CV-01929-DCN, 2017 WL 1206408, at *3 (D.S.C. Mar. 31, 2017) (compiling published, non-Fourth Circuit cases). Such a wait-and-see approach contravenes a central purpose of magistrate judge referrals: to focus the parties' attention on the issues, narrow the number and scope of disputes, and thus conserve judicial resources. *Jesselson v. Outlet Assocs. of Williamsburg, Ltd. P'ship*, 784 F. Supp. 1223, 1228-29 (E.D. Va. 1991).

"However, it appears most districts in the Fourth Circuit have instead followed the holding in *United States v. George*, 971 F.2d 1113, 1118 (4th Cir.1992)." *Deakins v. Pack*, 957 F. Supp. 2d 703, 735 n.48 (S.D.W. Va. 2013). *George* held that a district court must consider objections to the magistrate judge's ruling, even if the objections are new arguments on an issue. So, W&L's newfound arguments must be considered. *See, e.g., St. John v. Moore*, 135 F.3d 770, 1998 WL 71516 (4th Cir. 1998); *Samples v. Ballard*, 860 F.3d 266, 271-72 (4th Cir. 2017) (extending *George* to habeas context).

Nonetheless, on the merits, the Court overrules W&L's objection. Judge Ballou acknowledged the complexity of the underlying technology at issue in this case, making a technical expert necessary. (R&R at 15). Moreover, the case did not settle until after Soost spent the time and effort to familiarize himself with the record and prepare his report. The Court does not believe that billing approximately three workdays to review documents, or conferencing with attorneys for roughly a day and a half, is necessarily unreasonable in light of the number of documents produced in this case and the technical issues presented. And without endorsing the handful of other billing entries that W&L (still generically) identifies as problematic (dkt. 72 at 4-5), the Court finds the fees requested for technical expert Soost were on the whole reasonable and identifiable. Mathematical precision is not required when assessing fees and costs. *See*

Page 12

*Knussman v. Maryland*, 73 F. App'x 608, 613 n.3 (4th Cir. 2003); *ECOS, Inc. v. Brinegar*, 671 F. Supp. 381, 394 (M.D.N.C. 1987); *Dillon v. BMO Harris Bank, N.A.*, No. 1:13-CV-897, 2017 WL 564501, at *7 (M.D.N.C. Feb. 10, 2017), *aff'd sub nom. Six v. Generations Fed. Credit Union*, 891 F.3d 508 (4th Cir. 2018).

\* \* \*

In conclusion, the objections to the R&R will be largely overruled. The Court will sustain the objection to the exclusion of 53 hours billed for pre-litigation work by Zen42's counsel, and add the corresponding amount of fees ($15,901) to the amount recommended by the R&R ($96,180.48). That comes to a total fee award of $112,081.48.

Entered on this 26th day of September, 2018.

/s/
NORMAN            K.            MOON



SENIOR UNITED STATES DISTRICT JUDGE

--------

Footnotes:

1. W&L's citation to *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 179 (4th Cir. 1994) is distinguishable and unconvincing for several reasons, including the fact that that case, filed in West Virginia, involved issues far more complex than this case, and the plaintiff sued state and local politicians, making retention of local counsel difficult.

2. The Court bases this reduction on reasonableness and not—as Zen42's objection implies (dkt. 70 at 13)—on the degree of success of a given filing.

3. Zen42 also again challenges W&L's fee expert as unqualified and providing unsupported opinions. (Dkt. 70 at 15-17). The Court reaffirms its decision *supra* that Ms. Bentley is qualified as an expert and that her opinions are sound. In any event, her opinions are not necessary to the finding that Zen42's fees are unreasonable.

4. Zen42 reiterates its objection to W&L's fee expert and challenges her opinion on the fee expert issue. The Court holds the three experts on fees unreasonable without reference to W&L's fee expert, as the burden is on the claimant to assert the reasonableness of its fees. In any event, the Court has previously explained it finds W&L's fee expert qualified to opine on billing and related practices in this jurisdiction.

5. Zen42 asserts that it is error to reduce fees-on-fees for being excessive in comparison to the fees generated by the underlying litigation. It is true that the fees-on-fees here are excessive in proportion to the overall fees and hours billed. But they are also excessive in light of the needs, complexity, and circumstances of the case on the whole.

In any event, by overbilling during the pre-litigation and litigation stages of the case, it would be unsurprising (but still unacceptable) for counsel to overbill when preparing a fee petition summarizing the inflated original fees.

--------

fastcase